814 So.2d 925 (2000)
Thomas Dale FERGUSON
v.
STATE.
CR-97-2524.
Court of Criminal Appeals of Alabama.
June 30, 2000.
Rehearing Denied August 18, 2000.
*933 Arthur P. Clarke, Mobile; and Glenn L. Davidson, Mobile, for appellant.
Bill Pryor, atty. gen., and Rosa H. Davis, asst. atty. gen., for appellee.
LONG, Presiding Judge.
The appellant, Thomas Dale Ferguson, was indicted for four counts of capital murder in connection with the shooting deaths of Harold Pugh and his 11-year-old son Joey Pugh. The jury found Ferguson guilty of all counts charged in the indictment: two counts of murder made capital because the killings were committed during the course of a robbery in the first degree, see § 13A-5-40(a)(2), Ala.Code 1975; one count of murder made capital because it involved the murder of two or more persons by one act or pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala.Code 1975; and one count of murder made capital because the victim was less than 14 years old, see § 13A-5-40(a)(15), Ala.Code 1975. The jury recommended, by a vote of 11-1, that Ferguson be sentenced to life imprisonment without the possibility of parole. The trial court overrode the jury's recommendation and sentenced Ferguson to death by electrocution.
On appeal, Ferguson raises numerous issues, most of which he did not raise by objection in the trial court. Because Ferguson was sentenced to death, his failure to object at trial does not bar our review of these issues; however, it does weigh against Ferguson as to any claim of prejudice he now makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Crim.App. 1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
Rule 45A, Ala.R.App.P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
This court has recognized that "`the plain error exception to the contemporaneous-objection rule is to be "used sparingly, *934 solely in those circumstances in which a miscarriage of justice would otherwise result."'" Burton v. State, 651 So.2d 641, 645 (Ala.Crim.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting in turn United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)). Accordingly, we will address the issues raised by Ferguson on appeal.
The State's evidence tended to show the following. On July 21, 1997, Harold Pugh and his 11-year old son Joey Pugh were reported missing to the Colbert County Sheriffs Department. Mike Sennett, a friend of the Pughs, testified that in the early evening hours of July 21, after hearing that the Pughs were missing, he and several friends went looking for the Pughs at Cane Creek in Colbert County. The local authorities and a rescue squad were also searching for the Pughs in this same area. Sennett testified that Harold and his son were avid fishermen. Making one more pass up Cane Creek in his boat before going home, Sennett found the bodies of Harold and Joey Pugh floating in the creek. Autopsies conducted the following day revealed that each victim had been shot twice in the head.
Several days later, on July 26, 1997, a boat was found in a clearing in a remote wooded area in neighboring Franklin County. In the boat were rods and reels, a tacklebox, life jackets, a baseball-style cap with a wristwatch inside it (on the boat's front seat), and another baseballstyle cap on the backseat. At Ferguson's trial, the individual who found the boat testified that because he had heard television and radio reports that the sheriff's department was looking for a boat, a description of which matched that of the boat he found in the wooded area, he telephoned the sheriff's department.
Oscar Hood of the Colbert County Sheriff's Department testified that he received the call concerning the boat and that when he arrived at the location, the boat appeared to be the boat that the authorities were looking for in connection with the Pughs' murders. Hood ran a registration check on the boat and determined that it was in fact Harold Pugh's boat. Other testimony at trial showed that a pedestal-type seat had been removed from the boat and that two spent 9mm shell casings were found inside the boat.
Further testimony revealed that on the day the victims' bodies were found, two armed men wearing dark-colored army fatigues, hooded shirts, sunglasses, and gloves had robbed the Deposit Guaranty National Bank in Belmont, Mississippi. An employee at the bank testified that she could not identify the men, but that she could identify the truck the men had fled in after the robbery. She described the truck as a black Chevrolet Z-71 pickup truck with a chrome toolbox in the rear bed. Shortly after the robbery, a truck matching that description was found by an officer of the Belmont Police Department five miles from the bank, in a heavily wooded area. The truck, which had been set on fire, was discovered after the police saw the smoke from the fire. On the front passenger-side floorboard of the truck, the police found a pedestal-type seat, which, according to testimony, was typical of the seats found in the front of bass-fishing boats.
Following his arrest, Ferguson gave police a statement concerning his involvement in the robbery and murders of Harold and Joey Pugh and in the robbery of the bank in Mississippi. Ferguson told police that he and his four codefendants *935 Mark Moore,[1] Michael Craig Maxwell,[2] Donald Risley, and Kino Grahamhad conspired to rob banks to get money. According to Ferguson, they bought clothing matching that described by the employee of the bank robbed in Belmont, Mississippi, to wear during the robberies, and Moore also bought guns, handheld radios, and other items to use in the robberies. Ferguson told police that Moore was the "leader" of the group.
In addition, Ferguson told police that on the day of the murders, he and the others were looking for two cars to steal to use in the Belmont bank robbery. According to Ferguson, while he, Moore, Maxwell, Graham, and Risley were looking for a car to steal, they saw the Pughs' truck parked near the boat landing at Cane Creek. When the Pughs arrived at the landing in their boat, Ferguson said, Harold Pugh got out of the boat and into his truck. According to Ferguson, before he knew it, Maxwell was holding a gun to the Pughs and was ordering the Pughs to get back into the boat. Ferguson said that Maxwell jumped into the boat, along with Moore, and that Moore then ordered Ferguson to get into the boat. According to Ferguson, Maxwell was armed with a 9mm pistol and Moore was armed with a .357 pistol. Ferguson maintained that he did not have a weapon. Ferguson stated that they then left in the boat with the victims, heading downstream, while Risley and Graham waited with the truck. According to Ferguson, he heard a shot and saw that Maxwell had shot Harold Pugh. Ferguson claimed that he did not know who shot Joey Pugh, but he did say that Maxwell and Moore threw the victims' bodies into the creek.
Ferguson stated that after the shooting he became physically ill and that he was throwing up and very upset. Ferguson further stated that after the murders, Moore threatened him, telling Ferguson that if he told anyone about what had happened, he would kill Ferguson and Ferguson's family.
Ferguson stated that after returning the boat to the landing where Graham and Risley were waiting, he and the others then loaded the boat onto the trailer and drove the Pughs' truck and the boat to a clearing in the woods in Franklin County. Ferguson said that he removed a pedestal-type seat from the boat and threw it inside the victims' truck.
The following morning, according to Ferguson, Moore came to his house and the two left together to pick up Risley. Then, Ferguson said, they went to Maxwell's apartment where everyone, except Graham, who did not come to Maxwell's apartment, discussed plans to rob the bank in Belmont, Mississippi. Ferguson stated that Maxwell and Risley, who, according to Ferguson, were going to be the ones to go inside the bank, left Maxwell's apartment in Maxwell's car, followed by him and Moore in Moore's truck, and drove to where they had left the victims' truck and boat. From that location, Ferguson said, Risley drove the victims' truck to Belmont, and Maxwell drove his own car, while he and Moore followed in Moore's truck. Maxwell stated that he and the other men then drove to a location in Belmont, near the bank, where they left Maxwell's car. From there, Ferguson said, Maxwell and Risley drove the victims' truck to the bank as he and Moore, who were to act as *936 "covers" while the bank was being robbed, followed in Moore's truck. Ferguson stated that after Maxwell and Risley had committed the robbery, Maxwell drove the victims' truck back to the location where they left Maxwell's car, and he and Moore met them at that location. Ferguson said that they put their guns in Moore's truck, and put the clothes they had worn in the robbery in the victims' truck. According to Ferguson, Risley then poured gasoline on the victims' truck and set it on fire. Ferguson stated that he and the others then returned to Maxwell's apartment, where they divided the proceeds of the bank robberyapproximately $40,000.
Shortly after the questioning ended and Ferguson had completed his statement, Ferguson told Investigator Frank Brians that he had something else he wanted to say. Ferguson then stated that he had lied in his earlier statement when he said that Moore was at Cane Creek and on the boat when the Pughs were murdered. Ferguson now said that Moore was not at Cane Creek and that Moore was not on the boat when the victims were shot, but that only Ferguson and Maxwell were on the boat with the victims. Ferguson, who still maintained that he was not armed while on the boat, now claimed that Maxwell shot both victims.
Donald Risley, one of Ferguson's codefendants, testified at Ferguson's trial and corroborated most of Ferguson's statement to police. Risley's wife and Ferguson's wife were first cousins, and Risley had been friends with Ferguson for approximately eight years. Risley testified that Ferguson had approached him and asked him if he wanted to get involved in the plan to rob banks to get some "easy money." (R. 510.) Risley stated that Moore and Maxwell were the "leaders of the group." (R. 514.) Risley, like Ferguson, testified concerning the circumstances surrounding the murders at Cane Creek and the bank robbery in Belmont. Risley testified that on the afternoon of the murders, Ferguson picked him up at a friend's, Daryl May's, house and that he and Ferguson then went to Maxwell's apartment. From there, Risley said, they went to Cane Creek where they saw the victims' truck parked at the boat landing. Risley stated that he was armed with a .357 pistol, that Maxwell had a 9mm pistol, that Graham had a Colt .45 pistol, and that Ferguson was carrying a .357 pistol. Testifying to essentially the same facts as Ferguson did concerning how they approached the Pughs and ordered them into the boat, Risley further testified that Maxwell and Ferguson got into the boat with the victims and Maxwell drove the boat downstream. Risley said that the victims were sitting in the back of the boat, while Ferguson was standing near the front and was pointing a gun at the Pughs. Risley testified that neither he nor Ferguson were threatened into robbing the Pughs and that no one threatened Ferguson to get him to get into the boat. According to Risley, when Ferguson and Maxwell returned in the boat, approximately 10 minutes after they had left, neither victim was in the boat and Ferguson was sitting on a pedestal-type seat in the front of the boat.
Risley continued to testify to the events that occurred after the murders up until the time of the robbery of the bank in Mississippi. Risley testified to essentially the same facts as did Ferguson in his statement to police. Risley stated that Ferguson took the pedestal-type seat out of the boat and put it in the truck because, Risley said, Ferguson was afraid that he might have touched it and left his fingerprints on it. Risley also stated that while he was at Cane Creek, Ferguson never appeared to be sick or upset, and he never saw Ferguson throw up. Risley further told police that several days after the murders, *937 Ferguson, in response to Risley's question whether he had shot the Pughs, said that he had and further told Risley that he and Maxwell had shot them because they did not want any witnesses. Ferguson also told Risley that he shot Harold Pugh and that Maxwell shot Joey Pugh. Maxwell, who was also present during Risley's and Ferguson's conversation about the shooting, told Risley that Harold was not dead after the first shot, so he shot him again and he made Ferguson shoot Joey again.
Other evidence at trial showed that the 9mm pistol police took from Moore's house was the weapon that fired at least one of the bullets recovered from Harold Pugh's body. The two spent shell casings found in the boat were also fired by the 9mm pistol recovered from Moore's house. The evidence further showed that one of the bullets recovered from Harold's body and one of the bullets recovered from Joey's body were lead semi-wad cutter bullets that could be loaded in either a .38 or .357 pistol. Although the State's firearms expert could not conclusively state that a.357 pistol taken from Moore's house was the weapon that fired two of the bullets recovered from the victims' bodies, he was able to say that the pistol was the type of pistol that could fire that particular type of bullet. The State's firearms expert also testified that a bag of ammunition, which had been taken from Ferguson's house and submitted to him for evaluation, contained ammunition that was capable of being fired through the .357 pistol recovered from Moore's house.
There was also testimony that Ferguson, Maxwell, Graham, and Moore had all worked together at a furniture distribution center in Russellville, in Franklin County, Alabama. All of the men, except Graham, quit their jobs, or failed to return to work, in the early to middle part of July 1997, just several weeks before the Pughs' murders and the bank robbery in Belmont. Graham last reported to work on August 20, 1997. Also, Daryl May, a friend and coworker of Ferguson's, testified that on the afternoon of the murders, Maxwell came to his house to pick up Ferguson, who was watching television there. May also testified that because Risley did not have a car, he drove him to work every morning, except the morning of July 21, the day after the murders. May said that Risley did not show up for work that morning. Testimony also showed that in late July 1997, shortly after the bank robbery in Belmont, Ferguson paid $1,750 in cash for a used car, using "new" $20 bills.

I.
Ferguson contends that the trial court erred in denying his motion for individually sequestered voir dire. Specifically, he maintains that individual questioning in a sequestered setting was necessary to obtain honest answers from prospective jurors regarding their exposure to pretrial publicity and any possible prejudice and bias resulting from that exposure.
Immediately before voir dire examination began, in conditionally denying Ferguson's motion, the trial court stated: "That is what I usually do, is have general qualifications and then if you have anybody you would like to individually voir dire, I will allow that and that is what I plan to do in this case." (R. 9.) The 60-member venire was then questioned as a whole by the trial court, the prosecutor, and Ferguson's attorneys. The record reflects that after general voir dire, Ferguson did not request to question any jurors individually.
"`In Alabama, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination. This rule applies to capital cases, and the *938 granting of a request for individual voir dire is discretionary with the trial court.' Coral v. State, 628 So.2d 954, 968 (Ala. Cr.App.1992). `The fact that the appellant's case involved capital murder is not alone reason to require individual voir dire.... A trial court's decision in denying individual voir dire examination of a jury panel will not be disturbed on appeal absent an abuse of that discretion.' Smith v. State, 588 So.2d 561, 579 (Ala.Cr.App.1991). See also Henderson v. State, 583 So.2d 276, 283 (Ala.Cr.App. 1990), affirmed, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992)."
Taylor v. State, 666 So.2d 36, 66 (Ala.Crim. App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).
We have reviewed the record of the voir dire examination; the method of voir dire used by the trial court was sufficient to provide reasonable assurances that any prejudice and bias would have been discovered, if present. Ferguson has offered no evidence, either at trial or on appeal, to indicate that he was prejudiced by the prospective jurors' being questioned in a group, as opposed to being questioned in an individual, sequestered setting. On appeal, he has offered only general arguments concerning the possibility of prejudice; he has failed to show any bias or prejudice on the part of any prospective juror and he has offered no proof that pretrial publicity was so extensive that the method of voir dire was inadequate to ensure juror impartiality.
The record reflects that the prospective jurors were thoroughly questioned regarding any possible bias or prejudice and regarding their exposure to pretrial publicity. The jurors were asked to complete a juror questionnaire, were encouraged to provide honest answers, and were instructed that if they did not wish to answer a question in front of other jurors, they could approach the court at a later time and answer the question in private. In addition, as the State correctly points out in its brief to this court, Ferguson's motion for a change of venue was granted and the case was transferred from Colbert County, in northwestern Alabama, to Mobile County, in southwestern Alabama. A review of the voir dire reveals that, as a result of this change of venue, not a single prospective juror had heard or read about the Colbert County case before being called for jury duty.
Accordingly, we find that the trial court did not abuse its discretion in denying Ferguson's motion for individual, sequestered voir dire examination.

II.
Ferguson contends that the trial court erred when, before the lunch recess on the first day of the voir dire examination, it failed to instruct prospective jurors to avoid reading or watching any news reports about the case. In addition, he claims that when the jurors returned from the recess, the trial court "exacerbated this error by making no inquiry into whether the jurors had been improperly exposed to media during the break." (Ferguson's brief to this court, p. 39.) Because Ferguson did not object to this alleged error, we may review his claim only for plain error. See Rule 45A, Ala. R.App.P.
The record reflects that, on the first day of trial, during voir dire, the trial court dismissed the prospective jurors for a short restroom break. Before excusing the jurors, the trial court instructed them not to discuss the case among themselves or with anyone else, but did not instruct them not to read or watch any media reports about the case. During the break, *939 an off-the-record discussion was held with the attorneys, and the trial court then stated for the record that court would be recessed for lunch. The trial court asked the bailiff to inform the jurors about the lunch recess. No further instructions were given to the jurors. When the jurors returned from lunch, voir dire examination continued; no inquiries were made regarding any exposure to publicity during the recess.
Although we agree with Ferguson's claim that "jurors should not be permitted to read newspaper accounts of their case while discharging their duties" (Ferguson's brief to this court, p. 39), Ferguson has failed to show, or even to allege that any prospective juror actually read or heard anything about the case during the lunch recess. No incidents regarding improper jury influence were brought to the trial court's attention during the course of Ferguson's trial, and on appeal Ferguson does not claim that any such incident even occurred. Rather, Ferguson contends only that the trial court's failure to instruct the jurors not to read or watch any news accounts about the case created a "chance" that the venire was contaminated with outside information. (Ferguson's brief to this court, p. 39.) Contrary to Ferguson's contention, a mere "chance" is simply not sufficient to warrant reversal. We will not base error on speculation and conjecture. See McNair v. State, 706 So.2d 828, 838 (Ala.Crim.App.1997).
Moreover, although the trial court did not specifically instruct prospective jurors on the first day of trial before recessing for lunch not to read or watch any news reports about the case, the trial court did give a detailed instructionin which the jurors were instructed not to read or watch any media accounts of the case before a subsequent break during voir dire, and on numerous occasions throughout the remainder of Ferguson's trial. As we stated in Woods v. State, 789 So.2d 896 (Ala.Crim.App.1999), in addressing an identical claim:
"The trial court was not obliged to give [a] detailed instruction every time the jury took a break during the trial. Such a requirement would be unduly burdensome and unreasonable. It is clear from the record that the jury was more than aware that it was not to have any outside exposure concerning the case. No error, much less plain error, occurred here."
789 So.2d at 913.
Similarly, we find that the trial court's instructions before the lunch recess were adequate, although they did not include a specific instruction to avoid media accounts of the case. Prospective jurors, and the jurors who ultimately sat on Ferguson's jury, were given detailed instructions on numerous occasions throughout the trial not to discuss the case among themselves or with anyone else and not to read or watch any media accounts of the case. The jurors were well aware that they were not to have any outside exposure regarding the case. Moreover, Ferguson has not established that he was prejudiced by the trial court's failure to give a lengthy and detailed instruction before the lunch recess; he has failed to show, or even to allege, that any juror was improperly influenced by publicity or other outside information during the recess. Accordingly, we find no error, much less plain error, as to this claim.

III.
Ferguson contends that the prosecutor improperly referred to the jury's sentencing verdict as a "recommendation" during voir dire; doing so, he says, diminished the jury's role in sentencing, in violation *940 of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The record reflects that while questioning prospective jurors during voir dire regarding their views on the death penalty, the prosecutor, on one occasion, used the word "recommendation" when referring to the jury's sentencing verdict. Ferguson's counsel objected to the prosecutor's comment and moved for a mistrial. The trial court denied the motion. Ferguson renewed the motion at the close of the State's case and the trial court again denied it.
In addressing a similar claim in Hagood v. State, 777 So.2d 162 (Ala.Crim.App. 1998), aff'd in pertinent part, rev'd on other grounds, 777 So.2d 214 (Ala.1999), we stated:
"`In Martin v. State, 548 So.2d 488 (Ala.Cr.App.1988), aff'd, 548 So.2d 496 (Ala.1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989), this Court reiterated the rule enunciated in Caldwell v. Mississippi, that the prosecutor could not mislead a jury to believe that, while it may impose a death sentence upon a defendant, the ultimate responsibility for determining the appropriateness of the death sentence lay elsewhere. The Martin Court stated as follows:
"`"Under Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985), `it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere.' However, the comments of the prosecutor and the instructions of the trial court accurately informing a jury of the extent of its sentencing authority and that its sentence verdict was `advisory' and a `recommendation' and that the trial court would make the final decision as to sentence does not violate Caldwell. `Comments which accurately explain the respective functions of the judge and jury are permissible under Caldwell "as long as the significance of [the jury's] recommendation is adequately stressed."' Harich v. Wainwright, 813 F.2d 1082, 1101 (11th Cir.1987). Here, neither the prosecutor nor the trial court misrepresented the effect of the jury's sentencing recommendation. The cases of Caldwell, supra; Mann v. Dugger, 817 F.2d 1471 (11th Cir.), vacated, 828 F.2d 1498 (1987); Adams v. Wainwright, 804 F.2d 1526 (11th Cir. 1986), modified, Adams v. Dugger, 816 F.2d 1493 (11th Cir.1987); and Harich, supra, each involved a situation where the prosecutor and the trial court misled the jury as to its critical role in sentencing under state law. In Hooks v. State, 534 So.2d 329 (Ala.Cr.App.1987), this Court reviewed the decisions of other jurisdictions which have confronted this issue and concluded: `The trial judge's and the prosecutor's remarks clearly defined the jury's role in the sentencing scheme. Thus, the jury could not have been confused as to its responsibility in the sentencing process. The remarks made here were a correct statement of the law and did not tend to mislead or misinform the jury. Therefore, we conclude the remarks were not improper under Caldwell, supra.'"
"`548 So.2d at 494.'
"Travis v. State, 776 So.2d 819, 854 (Ala. Cr.App.1997). See also Price v. State, 725 So.2d 1003, (Ala.Cr.App.1997); Ex *941 parte Taylor, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996); Mason v. State, 768 So.2d 981 (Ala.Cr.App.1998).
"After reviewing the record in its entirety, as well as the context in which the allegedly inappropriate comments were made, we find that `there is "no reasonable possibility that the jury was misled, misinformed, or confused as to its critical role in sentencing under Alabama law."' Price, quoting Taylor v. State, 666 So.2d 36, 51 (Ala.Cr.App.1994). `The prosecutor's comments and the trial court's instructions "accurately informed the jury of its sentencing authority and in no way minimized the jury's role and responsibility in sentencing."' Weaver v. State, 678 So.2d 260, 283 (Ala. Cr.App.1995), rev'd on unrelated grounds, 678 So.2d 284 (Ala.1996)."
777 So.2d at 202-03.
Similarly, after reviewing the prosecutor's comment in this case, we find that the jury was not misled as to its critical role in sentencing. Although the prosecutor referred to the jury's sentencing verdict as a recommendation, the prosecutor stressed that that recommendation was "extremely important." (R. 142.) The prosecutor's comment was an accurate statement of the law in Alabama; it did not minimize the jury's role as Ferguson suggests.

IV.
Ferguson contends that the trial court erred in granting the State's challenges for cause as to five veniremembers, based on their views on the death penalty. He maintains that by granting the State's challenges for cause the trial court not only violated his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments, but also violated "the equal protection rights of the excluded jurors." (Ferguson's brief to this court, p. 54.)
Initially we note that although Ferguson contends that he objected to the challenges "on the ground that the removal of jurors who had expressed reservations about the propriety of the death penalty was improper and unconstitutional," a review of the record belies this claim. (Ferguson's brief to this court, p. 54.) After the State challenged the five jurors for cause, Ferguson's counsel stated the following objection: "I mean, the wholeI object to the whole idea of death qualifying the jury, but beyond that I have no other comments." (R. 151.) Clearly, Ferguson objected to death-qualifying the jury, not to the State's specific challenges for cause. Thus, we review this claim pursuant to the plain-error rule. See Rule 45A, Ala. R.App.P.
Although we agree that "[v]eniremembers cannot be properly excluded merely because they express some reservations about the death penalty" (Ferguson's brief to this court, p. 54), it is well settled that "the State may successfully challenge for cause any prospective juror who would refuse to impose the death penalty under any circumstances." Jackson v. State, [Ms. CR-97-2050, May 28, 1999] ___ So.2d ___, ___ (Ala.Crim.App. 1999). See also § 12-16-152, Ala.Code 1975. In Taylor v. State, 666 So.2d 36 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996), we stated the following regarding the standard for challenges for cause:
"`The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is "whether the juror's views would `prevent or substantially impair the performance of his duties as a juror in accordance with his *942 instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, [424,] 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); Gray v. Mississippi, 481 U.S. 648 [at 657-58], 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). "The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment." Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). A juror's bias need not be proved with "unmistakable clarity" because "juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." Id.

"`A trial judge's finding on whether or not a particular juror is biased "is based upon determination of demeanor and credibility that are peculiarly within a trial judge's province." Witt, 469 U.S. at 429, 105 S.Ct. at 855. That finding must be accorded proper deference on appeal. Id. "A trial court's ruling on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion." Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala.1981).'"
666 So.2d at 47, quoting Martin v. State, 548 So.2d 488, 490-91 (Ala.Crim.App.1988), affirmed, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). See also Perkins v. State, 808 So.2d 1041 (Ala.Crim.App.1999); Dallas v. State, 711 So.2d 1101 (Ala.Crim.App.1997), aff'd, 711 So.2d 1114 (Ala.), cert. denied, 525 U.S. 860, 119 S.Ct. 145, 142 L.Ed.2d 118 (1998).
Each of the five prospective jurors challenged for cause stated unequivocally that he or she would not, under any circumstances and regardless of the evidence presented, impose the death penalty. Clearly, their views would "prevent or substantially impair" their ability to perform their duties as jurors. Accordingly, the trial court did not err in granting the State's challenges for cause.

V.
Ferguson contends that the trial court erred in admitting into evidence his post-arrest statement to the police because, he says, the statement was not voluntary. Specifically, he argues that there is no evidence of "any valid waiver" of his Miranda rights because, he says, the waiver-of-rights form admitted into evidence by the State (and signed by Ferguson) was dated July 22, 1997, a month before he gave his statement to police on August 22, 1997. He maintains that "[s]uch a long length of time between the reading of the Miranda warnings and the subsequent confession depriv[ed] the warnings of their protective effect," and rendered his statement involuntary. (Ferguson's brief to this court, p. 51.) Ferguson did not challenge the admission of his statement at trial; therefore, we will review this claim for plain error. Rule 45, Ala.R.App.P.
The record reveals that Frank Brians, the investigator with the Colbert County Sheriff's Department who interviewed Ferguson and took his statement, testified that he questioned Ferguson on August 22, 1997. Brians stated that he read Ferguson his Miranda rights at 5:52 p.m., and begap the interview six minutes later at 5:58 p.m. Brians acknowledged that the waiver-of-rights form was dated July 22, 1997, but he said that that was a mistake and that the correct date, as indicated on the tape recording and on the transcript of the interview, was August 22, 1997. Brians further testified that Ferguson said he understood his rights and that he wanted *943 to waive them and give a statement. Moreover, we point out that under the facts of this case, it would have been impossible for Ferguson to have been read his Miranda rights on July 22. The victims bodies were not found until July 21, Ferguson robbed the bank in Belmont, Mississippi on July 22, and the Pughs' boat was not found until July 26. Ferguson and his codefendants did not become suspects in the case until early to mid-August 1997, and, thus, would have had no contact with police before that time.
Based on our review of the record, we find no merit to Ferguson's claim, and thus, no error, plain or otherwise, occurred. Accordingly, we hold that the trial court did not err in admitting the statement at trial.

VI.
Ferguson contends that the trial court improperly admitted hearsay testimony that, he says, was "severely prejudicial" and "undermined the reliability of [the] verdict." (Ferguson's brief to this court, pp. 30-31.) Specifically, Ferguson refers to a portion of his post-arrest statement to police where his lawyer, who eventually withdrew from the case because of illness, posed several questions to Ferguson, which Ferguson answered, concerning his decision to give the police a statement. This issue is presented for the first time on appeal; therefore, we will review it pursuant to the plain-error rule. Rule 45A, Ala.R.App.P.
The record shows that after having been read his Miranda rights and then waiving those rights, the following occurred at the beginning of Ferguson's statement to police:
"[Ferguson's counsel]: Dale, you called me earlier today and you told me that you wanted to try to help yourself with the Colbert County Sheriff's Department and the FBI on these charges that are here pending today. You had information you thought that would help them. You realize that I have gone over with you your rights and told you that you don't have to talk, but it is your but you have informed me that you choose to help at this point to try to help yourself; is that correct?
"Ferguson: Yes, sir.
"[Ferguson's counsel]: Do you realize that there are no deals at this point?
"Ferguson: Yes, sir.
"[Ferguson's counsel]: That what you are doing is voluntary and you are doing it to try to help yourself in furtherance
"Ferguson: Yes, sir.
"[Ferguson's counsel]:of this; is that correct?
"Ferguson: Yes, sir.
"[Ferguson's counsel]: And this is what you want to do?
"Ferguson: Yes, sir.
"[Ferguson's counsel]: And do you realize that this is on the record, this tape that we are making here today can and will more than likely be used in court?
"Ferguson: Yes, sir.
"[Ferguson's counsel]: Okay. With that, do you want to go forward?
"Ferguson: Yes, sir."
(R. 262-63.) Contrary to Ferguson's contention, we find nothing improper about the admission of the complained-of statements of Ferguson's lawyer.
Rule 801(d)(2)(C), Ala.R.Evid., provides, in part, that a statement is not hearsay if it is offered against a party and is "a statement of which the party has manifested an adoption or belief in its truth." The statements made by Ferguson's lawyer, which Ferguson expressly adopted, by responding, "Yes" ("manifest[ing] his *944 adoption or belief in [their] truth"), were clearly admissible nonhearsay "adoptive admissions" under Rule 801(d)(2)(C).
Moreover, we note that later in his tape-recorded statement, not in response to any questioning from his lawyer but in response to Investigator Brians asking Ferguson if he had anything else he wanted to say on the tape recording, Ferguson said, "I hope I get to keep my life and not end up in no chair." (R. 324.) Clearly, Ferguson conveyed his motivation for giving a statement quite apart from any dialogue he had had with his lawyer at the beginning of the taped-recorded statement. Further (and not complained of as "hearsay" on appeal), Ferguson, at the end of the statement, and in response to his lawyer's question whether he had any remorse about the crime, said he had "been crying every day [and] hav[ing] nightmares every night." (R. 64-65.)
For the reasons stated above, we find no error, much less plain error, as to this claim.

VII.
Ferguson further contends that the trial court abused its discretion when it admitted into evidence photographs of the Pughs' bodies after they had been removed from the creek and photographs depicting their wounds because, he argues, the photographs were more prejudicial than probative. (Ferguson's brief to this court, pp. 48-49.) Ferguson did not object at trial when any of the photographs were introduced; thus, our review will be pursuant to the plain error rule. Rule 45A, Ala.R.App.P.
"Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102 (Ala.Cr.App.1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184 (Ala.Cr.App.1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So.2d 882, 883 (1973); Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Cr.App.1986) (videotape evidence). Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds. E.g., Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987). Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So.2d 91 (Ala.Cr.App.1987). Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors. Hutto v. State, 465 So.2d 1211, 1212 (Ala.Cr.App.1984)."
Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). This court has held that autopsy photographs, although gruesome, are admissible to show the extent of a victim's injuries. See Dabbs v. State, 518 So.2d 825, 829 (Ala. Crim.App.1987).
Here, the photographs in question depicted matters that were relevant and material to the issues in Ferguson's case and they corroborated the trial testimony. "The fact that a photograph is gruesome and ghastly is no reason to exclude it from the evidence, so long as the photograph *945 has some relevancy to the proceedings, even if the photograph may tend to inflame the jury." Bankhead v. State, 585 So.2d 97, 109-10 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993). "The state had the burden of proving that the victim was dead, and [these photographs were] direct evidence on that point." Jenkins v. State, 627 So.2d 1034, 1045 (Ala.Crim.App.1992), aff'd, 627 So.2d 1054 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994).
We have reviewed the complained-of photographs and we are unpersuaded by Ferguson's argument that they were improperly admitted. The photographs were admissible: they were relevant to show the crime scene and the injuries each victim suffered and they helped to illustrate the testimony of the investigating officers concerning the crime scene, as well as to illustrate the testimony of the coroner concerning the type and extent of the wounds that caused the victims' deaths
Applying the legal principles set out above to the facts of this case, we conclude that the trial court did not abuse its discretion in admitting the photographs into evidence.

VIII.
Ferguson further contends that the prosecutor engaged in several acts of misconduct at his trial. Initially we note that Ferguson failed to object to any of the prosecutor's acts he now alleges were misconduct. "`This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.'" Kuenzel v. State, 577 So.2d 474, 489 (Ala. Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). Thus, we will accordingly address Ferguson's claims of alleged prosecutorial misconduct. See Rule 45A, Ala.R.App.P.
This court has stated that "[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract." Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App. 1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App. 1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993). See also Henderson v. State, 583 So.2d 276, 304 (Ala.Crim.App. 1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). "In judging a prosecutor's closing argument, the standard is whether the argument `so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Bankhead, 585 So.2d at 107, quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). "A prosecutor's statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury." Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 538 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, "statements of counsel in argument *946 to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict." Bankhead, 585 So.2d at 106. "Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Crim.App.1978), and that court is given broad discretion in determining what is permissible argument." Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id.

A.
Ferguson contends that the prosecutor improperly elicited victim-impact evidence at the guilt phase of the trial. Specifically, he complains of testimony elicited concerning the name of the church the victims attended, a photograph of the Pughs taken before their murders standing in front of their boat, and testimony that Joey Pugh would have turned 12 on his next birthday, which occurred during Ferguson's trial. Ferguson argues that "this type of evidence is undoubtedly moving," but "irrelevant to the issue of guilt or innocence." (Ferguson's brief to this court, p. 32.) Ferguson did not object at trial to any of the prosecutor's alleged misconduct. Thus, we will review this claim pursuant to the plain-error rule. Rule 45A, Ala. R.App.P.
Contrary to Ferguson's contention, none of his alleged instances of prosecutorial error resulted in the improper admission of victim-impact evidence at the guilt phase of the trial. With regard to the testimony concerning the name of the victims' church, the record shows that Mike Sennett, who discovered the Pughs' bodies in Cane Creek, identified a picture of Harold and Joey Pugh while they were still alive, standing in front of their boat. This was necessary to establish that the Pughs were alive prior to July 20, 1997, and that they owned a boat and were avid fishermen. In order to identify the picture of the Pughs and information about the Pughs, the State had to establish for the jury how Sennett knew the victims. Sennett testified that he knew the victims from church and from Little League baseball. We fail to see any prejudice as a result of Sennett's telling the jury the name of the church that he and the Pughs attendeda church in North Alabama doubtfully familiar to the jurors in the case, since the case had been transferred from Colbert County to Mobile County. Further, the photograph showed the boat owned by the Pughs that was eventually found abandoned in Franklin County several days after the murders. A comparison of the photograph of the Pughs' boat depicted in the picture taken while the Pughs were alive provided the jury with something to compare to the photograph of the boat found in Franklin County, thus allowing the jurors to determine whether the boats in the pictures were the same, and thereby linking Ferguson to the robbery of the Pughs. We find nothing improper concerning the admission of the photograph and the accompanying testimony.
As to Ferguson's claim concerning testimony that Joey Pugh would have turned 12 on his next birthday had he lived, the age of the victim was a necessary element of the capital offense of the murder of a child less than 14 years old and was required to be proven by the State beyond a reasonable doubt. See § 13A-5-40(15), Ala.Code 1975. Thus, there was nothing improper about this testimony.

B.
Ferguson also contends that, during closing argument at the guilt phase of *947 the trial, the prosecutor "improperly provided the jurors with his personal opinion of the evidence." (Ferguson's brief to this court, p. 34.) Specifically, Ferguson argues that the prosecutor introduced error when he "offered advice on how to evaluate Ferguson's statement to police, which contradicted the testimony of his codefendant on the question of [Ferguson's] role in the shootings." (Ferguson's brief to this court, p. 34.) Ferguson did not object to the prosecutor's argument; therefore, our review will be for plain error. Rule 45A, Ala.R.App.P.
We have reviewed the complained-of portion of the prosecutor's argument and find that he was not offering his personal opinion concerning the evidence, but instead was merely expressing his opinion concerning inferences, deductions, and conclusions to be drawn from the evidence. As we stated in Drinkard v. State, 777 So.2d 225 (Ala.Crim.App.1998), aff'd. in pertinent part, rev'd on other grounds, 777 So.2d 295 (Ala.2000):
"`"While it is never proper for the prosecutor to express his personal opinion as to the guilt of the accused during closing argument, reversible error does not occur when the argument complained of constitutes mere expression of opinion concerning inferences, deductions and conclusions drawn from the evidence. See Woods v. State, 19 Ala. App. 299, 97 So. 179 (1923); Mitchell v. State, 50 Ala.App. 121, 277 So.2d 395, cert. denied, 291 Ala. 794, 277 So.2d 404 (1973); Mainor v. State, 339 So.2d 147 (Ala.Crim.App. 1976)."
"`Sams v. State, 506 So.2d 1027, 1029 (Ala.Cr.App.1986).'
"Wilson v. State, 652 So.2d 778, 781 (Ala.Cr.App.1994).
"We have examined the instances the appellant cites, as well as the context of the comments in the entire closing argument, and we find no plain error. The prosecutor was not expressing his personal opinion as to the appellant's guilt; he was merely giving his impression of the evidence. The fact that the prosecutor prefaced some of his comments with `I know' or `I think,' or a similar expression, does not render the comments improper.
"`. . . .'
"Roberts v. State, 735 So.2d 1244 (Ala. Cr.App.1997). See also Mason v. State, 768 So.2d 981 (Ala.Cr.App.1998)."
777 So.2d at 272-73. Further:
"In Bankhead v. State, 585 So.2d [97] at 105-06 [ (Ala.Cr.App.1989), aff'd in pertinent part, rem'd on another ground, 585 So.2d 112 (Ala.1991), opinion on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992), rev'd on another ground, 625 So.2d 1146 (Ala.1993) ], where the appellant's credibility was a fundamental issue for the jury's determination, the court held that it was permissible for the prosecutor to devote a substantial portion of the state's argument to persuading the jury that the state's two witnesses were more credible than the appellant and that the evidence was more consistent with their version of the events. The court held, `The credibility of a witness is a legitimate subject for criticism and discussion by either party during closing arguments.' Id. at 105. Based on this rule, the court also found that the prosecutor's references to the appellant as a `liar' were supported by the evidence and were therefore also permissible. See Cross v. State, 536 So.2d 155, 160 (Ala.Cr.App. 1988). See also United States v. Willis, 759 F.2d 1486, 1502 (11th Cir.) (in describing the appellants' defenses as `incredible *948 and ludicrous,' the prosecutor was not expressing personal opinion as to the appellant's guilt, but was merely drawing logical, noninflammatory inferences from the facts), cert. denied, 474 U.S. 849[, 106 S.Ct. 144, 88 L.Ed.2d 119] (1985); Holladay v. State, 629 So.2d 673, 684 (Ala.Cr.App.1992) (counsel was not ineffective for failing to object to prosecutor's closing argument on lack of credibility of the appellant's testimony; comments were reasonable inferences from the evidence); Smith v. State, 588 So.2d [561,] 571 [ (Ala.Cr.App.1991) ](the court approved the prosecutor's guilt-phase closing remarks that the testimony of a defense witness was `astonishing' and that the witness was `trying to mislead' the jury; the court found them to be proper inferences from the evidence)."
Thomas v. State, 766 So.2d 860, 938 (Ala. Crim.App.1998), aff'd, 766 So.2d 975 (Ala. 2000).
We have reviewed the prosecutor's comments in the context of the entire argument and we conclude that, contrary to Ferguson's assertion, the prosecutor was legitimately commenting on the evidence and was drawing reasonable inferences and conclusions from that evidence, specifically pointing out weaknesses in Ferguson's theory of the case, as shown by Ferguson's own statement. Moreover, the record shows that the prosecutor, throughout his closing argument, told the jurors that they were the sole judges of the facts and that it was their job to decide what was true and what was false. (R. 651.) In discussing Ferguson's statement during closing arguments, the prosecutor specifically told the jurors, "[O]nce again I can't tell you that [Ferguson] lied. You have got to decide that." (R. 665; see also R. 654-55.) Further, the trial court properly instructed the jurors that the comments and argument of counsel were not evidence in the case.
Accordingly, we find no error, plain or otherwise, as to this claim.

C.
Ferguson also contends that the prosecutor made improper comments during arguments at both the sentencing hearing before the jury and at the sentencing hearing before the trial court. Because Ferguson did not object to these allegedly improper comments, we review this claim only for plain error. See Rule 45A, Ala. R.App.P.
First, Ferguson contends that, during closing argument at the sentencing hearing before the jury, the prosecutor improperly compared his rights to the rights of the victims. However, because the jury recommended a sentence of life imprisonment without the possibility of parole, any error in the prosecutor's comments was harmless. See, e.g., Taylor v. State, 808 So.2d 1148, 1190 (Ala.Crim.App. 2000)("even if we were to find these comments improper, which we do not, it would be harmless because the jury returned a sentence recommendation of life imprisonment without parole"); Roberts v. State, 735 So.2d 1244, 1255 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 538 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999)("[E]ven if any error had occurred, it would have been harmless, because the jury recommended that Roberts be sentenced to life imprisonment without parole"); Giles v. State, 632 So.2d 568, 574 (Ala.Crim.App.1992), aff'd, 632 So.2d 577 (Ala.1993), cert. denied, 512 U.S. 1213, 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994)("[E]ven if the prosecutor's argument was improper and thus constituted error, the error was harmless since the jury returned a recommendation of life imprisonment without parole. Their recommendation would have been the same with or without the argument *949 of the prosecutor and, therefore, the appellant was not prejudiced by the prosecutor's argument."); Hooks v. State, 534 So.2d 329, 358 (Ala.Crim.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989)("even if the prosecutor's argument was improper and thus constituted error, the error was harmless since the jury returned a recommendation of life imprisonment without parole").
Ferguson also complains about the following comments by the prosecutor during rebuttal argument at the sentencing hearing before the trial court:
"If it please the Court, I promise to be brief, but I'd just like to respond to a few things that [Ferguson's counsel] has said. First of all, he says, repeatedly, that the defendant in this case didn't have a chance, well, he did have a chance. He made a choice. He squandered the chance that he had. The people in this case, that we often forget about, are the people who didn't have a chance, were Harold Pugh and his son, Joey. From the time that the defendant and his codefendants approached Harold Pugh and his son that afternoon at Cane Creek, the situation was set, he was determined and there's not one bit of evidence that shows that they, in any way, struggled or fought back or tried to resist in any way whatsoever. Harold and Joey were the people who didn't have a chance and weren't given a chance and were shown absolutely no compassion by this defendant and Craig Maxwell."
(R. 13-14, Vol.6.)
Ferguson maintains that this argument also improperly compared Ferguson's rights to the rights of the victims. We disagree. After reviewing the argument in context, it is clear that the prosecutor was not comparing Ferguson's rights to the rights of the victims, but instead, was merely arguing against the mitigating evidence offered by Ferguson. In arguing that the trial court should not override the jury's recommendation of life without parole, Ferguson's counsel argued to the trial court that because of Ferguson's childhood and low intelligence, "he never really had a chance." (R. 11, Vol.6.) The prosecutor then responded to this argument with the above-quoted comments. Taken in context, it is clear that the prosecutor was not even commenting on Ferguson's constitutional rights, much less comparing his rights to the rights of the victims, but instead, was commenting on evidence regarding Ferguson's lifewhich Ferguson had offered as mitigationby pointing out that Ferguson did, in fact, have a chance, that he had a choice in which course of action to follow, and that it was the victims who did not have a chance. Obviously, a prosecutor is permitted to argue to the trial court (or to the jury) that it should not find evidence offered by a defendant to be mitigating. Moreover, "[a] prosecutor has a right based on fundamental fairness to reply in kind to the argument of defense counsel." DeBruce v. State, 651 So.2d 599, 609 (Ala.Crim.App.1993), aff'd, 651 So.2d 624 (Ala.1994).
In addition, Ferguson contends that the prosecutor's comment that "there's not one bit of evidence that shows that they, in any way, struggled or fought back or tried to resist in any way whatsoever"was improper because, he says, whether the victims resisted was not relevant to the sole aggravating circumstance relied on by the Statethat the murders occurred during the course of a robbery in the first degree. Contrary to Ferguson's belief, the circumstances surrounding the crime are relevant to sentencing. See, e.g., Jackson v. State, 791 So.2d 979, 1023-24 (Ala.Crim.App.2000). *950 Moreover, we disagree with Ferguson's characterization that the prosecutor's comment was an argument to consider the circumstances surrounding the crime as a nonstatutory aggravating circumstance. After reviewing the record, we are convinced that the prosecutor's comment was not such an argument, but was merely an argument that the trial court should consider the circumstances surrounding the crime in determining what weight to give the aggravating circumstance. Moreover, in its sentencing order, the trial court found the existence of only one aggravating circumstancethat the murders were committed during the course of a robbery in the first degree. Thus, even if the prosecutor's comment was improper, which we do not believe it was, the error clearly had no effect on the trial court's sentencing, and was therefore harmless. See Rule 45, Ala.R.App.P.
Accordingly, we find no error, plain or otherwise, in the prosecutor's comments during the sentencing phase of the trial.

D.
Lastly, Ferguson contends that the cumulative effect of the prosecutor's alleged misconduct warrants a reversal of his conviction. Because we find that no single instance of the prosecutor's conduct was improper, any claim that the alleged improper conduct had a cumulative prejudicial effect on his trial is without merit and does not require a reversal. See Stewart v. State, 730 So.2d 1203 (Ala.Crim. App.1996), aff'd, 730 So.2d 1246 (Ala.), cert. denied, 528 U.S. 846, 120 S.Ct. 119, 145 L.Ed.2d 101 (1999); Hunt v. State, 642 So.2d 999 (Ala.Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994).

IX.
Ferguson contends that the evidence was insufficient to sustain his convictions for capital murder because, he says, the "sole evidence introduced to establish that [he] [intentionally] shot and killed the victims in this case was through the testimony of Donald Risley, [his] codefendant." (Ferguson's brief to this court, p. 53.) Ferguson maintains that a "conviction resting solely on the testimony of someone who has received such an outstanding deal in exchange for his testimony is constitutionally infirm, and cannot stand." (Ferguson's brief to this court, p. 53.) We find no merit to this claim.
"`"In reviewing the sufficiency of the evidence the appellate courts of this State are bound by several well settled rules. It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt and to a moral certainty. Instead, the function of this Court is to determine whether there is legal evidence from which a jury could by fair inference find the defendant guilty. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.), cert. denied, 368 So.2d 877 (Ala.1979); Scruggs v. State, 359 So.2d 836, 842 (Ala.Cr.App.), cert. denied, 359 So.2d 843 (Ala.1978).
"`"In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State and accord the State all legitimate inferences therefrom. Ellis v. State, 338 So.2d 428 (Ala.Cr.App.1976); Edson v. State, 53 Ala.App. 460, 301 So.2d 226 (1974). The evidence must be considered in the light most favorable to the prosecution. Colston v. State, 57 Ala. App. 4, 325 So.2d 520, cert. denied, 295 Ala. 398, 325 So.2d 531 (1976).
"`"Where there is legal evidence from which the jury can by fair inference find the defendant guilty, this Court has no right to disturb the verdict. *951 Bell v. State, 339 So.2d 96 (Ala. Cr.App.1976). A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust. Bridges v. State, 284 Ala. 412, 225 So.2d 821 (1969); Morton v. State, 338 So.2d 423 (Ala.Cr.App.1976)."'
"Freeman v. State, 505 So.2d 1079 (Ala. Cr.App.1986), quoting, Johnson v. State, 378 So.2d 1164, 1169 (Ala.Cr.App.1979), writ quashed by Ex parte Johnson, 378 So.2d 1173 (Ala.1979)."
Anderson v. State, 542 So.2d 292, 295-96 (Ala.Crim.App.1987), writ quashed, 542 So.2d 307 (Ala.), cert. denied, 493 U.S. 836, 110 S.Ct. 116, 107 L.Ed.2d 77 (1989), quoted in Bankhead v. State, 585 So.2d 97, 104 (Ala.Crim.App.1989), aff'd in part, remanded, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim. App.1992), rev'd on unrelated grounds, 625 So.2d 1146 (Ala.1993).
In Arthur v. State, 711 So.2d 1031 (Ala. Crim.App.1996), aff'd, 711 So.2d 1097 (Ala. 1997), we said the following regarding the corroboration of accomplice testimony:
"`An accomplice's testimony must be supported by evidence connecting the defendant with the commission of the offense rather than merely showing that the offense occurred or the circumstances thereof. Code of Alabama 1975, § 12-21-222; Miles v. State, 476 So.2d 1228 (Ala.Cr.App.1985); Jackson v. State, 451 So.2d 435 (Ala.Cr.App.1984)." Hodges v. State, 500 So.2d 1273, 1275 (Ala.Cr.App.1986).
"`"Corroboration need only be slight to suffice." Ingle v. State, 400 So.2d 938, 940 (Ala.Cr.App.1981). "While corroborating evidence need not be strong, it `... must be of substantive character, must be inconsistent with the innocence of a defendant and must do more than raise a suspicion of guilt.' McCoy v. State, 397 So.2d 577 (Ala.Crim.App.), cert. denied, 397 So.2d 589 (Ala.1981)." Booker v. State, 477 So.2d 1388, 1390 (Ala.Cr.App.1985). "However, the corroboration need not be sufficiently strong by itself to warrant a conviction." Miles v. State, 476 So.2d 1228, 1234 (Ala.Cr.App.1985). The requisite corroborative evidence is determined by a process of elimination or subtraction. Caldwell v. State, 418 So.2d 168, 170 (Ala.Cr.App.1981). "The means for analyzing the evidence to determine if there is sufficient evidence to corroborate testimony of an accomplice is to set aside the accomplice's testimony and determine whether or not the remaining evidence tends to connect the defendant with the commission of the offense." Leonard v. State, 459 So.2d 970, 971 (Ala.Cr.App. 1984). "Whether such corroborative evidence exists is a question of law to be resolved by the trial court, its probative force and sufficiency being questions for the jury." Caldwell v. State, supra, at 170. Circumstantial evidence is sufficient to show corroboration. Jackson v. State, 451 So.2d 435, 437 (Ala.Cr.App.1984). See also McConnell v. State, 429 So.2d 662 (Ala.Cr.App.1983).'
"Hodges v. State, 500 So.2d at 1275-76.
"In Ware v. State, 409 So.2d 886 (Ala. Cr.App.1981), writ quashed, 409 So.2d 893 (Ala.1982), this court quoted Andrews v. State, 370 So.2d 320, 322 (Ala. *952 Cr.App.), cert. denied, 370 So.2d 323 (Ala.1979), stating:
"`"The corroboration of an accomplice must tend to connect the accused with the commission of the crime but need not refer to any statement or fact testified to by the accomplice. `Corroborate means to strengthen, to make stronger; to strengthen, not the proof of any particular fact to which the witness has testified, but to strengthen the probative, criminating force of his testimony.' Malachi v. State, 89 Ala. 134, 140-141, 8 So. 104, 106 (1889); Smith v. State, 230 Ala. 413, 416, 161 So. 538 (1935); Brown v. State, 31 Ala.App. 529, 19 So.2d 88 (1944). The corroborative evidence need not be strong, nor sufficient of itself to support a conviction, the criterion being that it legitimately tend to connect the accused with the offense. Miller v. State, 290 Ala. 248, 275 So.2d 675 (1973). Corroborative evidence need not directly confirm any particular fact nor go to every material fact stated by the accomplice. Bridges v. State, 52 Ala.App. 546, 295 So.2d 266 (1974); Dykes v. State, 30 Ala.App. 129, 1 So.2d 754 (1941). Corroborative evidence need not directly connect the accused with the offense but need only tend to do so. State v. Canada, 107 Ariz. 66, 481 P.2d 859, cert. denied, 404 U.S. 848, 92 S.Ct. 154, 30 L.Ed.2d 87 (1971). See Pearce v. State, 26 Ala.App. 492, 495, 164 So. 114, cert. denied, 231 Ala. 150, 164 So. 118 (1935) (`(B)ut, as we read the cases, the corroboratory evidence, if it meets the test of "tending to connect the defendant with the commission of the offense," need not be, in and of itself alone, that tending in any wise to fasten guilt upon the defendant'); 23 C.J.S. Criminal Law § 812(3) (1961). The sufficiency of corroborating evidence is established if its probative value tends to connect the defendant with the commission of the crime. Lowe v. State, 32 Ala.App. 176, 22 So.2d 618 (1945). The corroboration of an accomplice may be shown by circumstantial evidence. Blevins v. State, 56 Ala.App. 115, 319 So.2d 734, cert. denied, 294 Ala. 753, 319 So.2d 739 (1975); Tidwell v. State, 23 Ala.App. 409, 126 So. 186 (1930).
"`"In certain instances, association with the accomplice tending to show the accused's proximity, chronologically and geographically, to the alleged offense may furnish sufficient corroboration. Ross v. State, 74 Ala. 532 (1883); De Graaf v. State, 34 Ala.App. 137, 37 So.2d 130 (1948)." 370 So.2d at 322.'
"409 So.2d at 891.
"Thus, to constitute sufficient corroboration, a fact or circumstance may tend to support the accomplice's version, thereby confirming his credibility, but in order to provide sufficient corroboration of accomplice testimony, the evidence must connect the accused with the commission of the offense. Jackson v. State, 451 So.2d 435, 437 (Ala.Cr.App.1984)."
711 So.2d at 1059-60. Further, "`it has been held that nonaccomplice evidence of an admission or confession by the accused is sufficient corroboration of an accomplices's testimony to sustain a conviction of the accused.'" Griffin v. State, 790 So.2d 267, 289 (Ala.Crim.App.1999), quoting C. Gamble McElroy's Alabama Evidence, § 300.01(9) (5th ed.1996). In addition, corroborative evidence "`"`need not directly confirm any particular fact nor affirm each and every material fact testified to by the accomplice.'"' See Leitner v. State, 672 So.2d 1371, 1376 (Ala.Crim.App.1995), quoting Wilson v. State, 690 So.2d 449 (Ala.Crim.App.1995).
*953 Applying the foregoing principles of law to the facts of this case, we conclude that Risley's testimony was amply corroborated and that the evidence was clearly sufficient to sustain Ferguson's convictions for capital murder. Ferguson acknowledged that he was on the boat with Maxwell when the Pughs were shot and that they were the only two individuals on the boat with the victims. Testimony from a friend of Ferguson's showed that Ferguson left with Maxwell in Maxwell's car on the afternoon of the murders. Evidence also showed that the victims suffered gunshot wounds from two different pistols, a 9mm and a.357, and further showed that Ferguson removed a pedestal-type seat from the boat and disposed of it because he was afraid that he might have left fingerprints on the seat. Ferguson also initially lied to police when he told them that Moore was on the boat with him and Maxwell when the victims were shot. Ferguson eventually admitted to police that Moore was not there. This evidence clearly "tend[ed] to connect [Ferguson] with the commission of the offense," Arthur, supra, and was more than sufficient evidence to corroborate Risley's testimony.
Moreover, any question concerning Risley's credibility, in light of his plea agreement with the State, affected only the weight the jury afforded his testimony, not its admissibility. The terms of Risley's plea agreement were before the jury; Ferguson's counsel extensively cross-examined Risley about the plea agreement; and counsel made the jury aware of the possible influences the agreement could have had on Risley's testimony. For the reasons stated above, we find no merit to this claim.

X.
Ferguson contends that, during its oral charge to the jury at the guilt phase, the trial court improperly implied that the jurors did not have to reach a unanimous verdict. Specifically, he argues that although the trial court instructed the jury that in order to find Ferguson guilty of the capital offenses as an accomplice, each and every juror must find beyond a reasonable doubt that Ferguson had the particularized intent to kill the victims, it failed to similarly instruct the jurors as to the unanimity requirement for the other charges. Thus, he concludes, the jurors likely understood the instructions to mean that they had to reach a unanimous verdict only when considering whether Ferguson was an accomplice to the capital offenses. (Ferguson's brief to this court, pp. 49-50). This claim was not presented to the trial court; thus, our review will be for plain error. Rule 45A, Ala.R.App.P. We find no merit to this claim.
Contrary to Ferguson's claim, the record reveals that the trial court properly instructed the jurors that all 12 jurors must agree before they could reach any verdict in the case. We find nothing confusing or misleading concerning the trial court's instructions on the requirement of a unanimous verdict. Thus, we find no plain error as to this claim.

XI.
Ferguson contends that, during its oral charge to the jury, the trial court "destroyed [his] presumption of innocence by repeatedly telling the jurors to examine the evidence in the `murders' (as opposed to the evidence in the case)." (Ferguson's brief to this court, p. 46.) This claim is presented for the first time on appeal; therefore, our review will be for plain error. Rule 45A, Ala.R.App.P.
Ferguson cites to several instances in the trial court's oral charge to the jury at the guilt phase where the transcript shows that the court used the misspelled word *954 "murderse." For example, he quotes a portion of the charge as follows: "`The presumption [of innocence] remains with him throughout every stage of the trial and during your deliberations on the verdicts and is not overcome unless from all of the evidence in the murderse, you are convinced beyond a reasonable doubt that the defendant is guilty.'" The State argues in its appellate brief, and our review of the record supports its position, that the court reporter, in preparing the transcript, replaced the letters "ca" in the words "case," "capital," "caution," and "cause," with the word "murder," resulting in the following typographical errors in the transcript of the oral charge: "murderse" for case, "murderpital" for capital, "murderution" for caution, and "murderuse" for cause. Clearly, Ferguson is relying on typographical errors in the record to support his argument. It is nonsensical and absurd to think that the trial court actually charged the jury using such nonexistent words as "murderse," "murderpital," "murderution," and "murderuse." We find no merit to this argument.

XII.
Ferguson contends that the trial court's instructions to the jury on reasonable doubt were "fatally flawed." (Ferguson's brief to this court, p. 62.) Specifically, he contends that the instructions improperly diminished the State's burden of proof, in violation of Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). Because Ferguson did not object to the allegedly improper instructions, we review his claim only for plain error. See Rule 45A, Ala.R.App.P.
In Knotts v. State, 686 So.2d 431 (Ala. Crim.App.), opinion after remand, 686 So.2d 484 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997), we stated:
"The Due Process Clause of the Fourteenth Amendment `protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). In Cage v. Louisiana, [498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990),] the United States Supreme Court found that a jury charge that defined `reasonable doubt' by using the phrases `grave uncertainty,' `actual substantial doubt,' and `moral certainty' could have led a reasonable juror to interpret the instructions to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause. Subsequently, the Court `made it clear that the proper inquiry is not whether the instruction "could have" been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it.' Victor v. Nebraska, 511 U.S. 1, 6, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994)(quoting Estelle v. McGuire, 502 U.S. 62, 72-73, 112 S.Ct. 475, 482, 116 L.Ed.2d 385, n. 4 (1991), emphasis in original). Thus, the constitutional question presented here is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the Winship reasonable doubt standard. Victor v. Nebraska; Ex parte Kirby, 643 So.2d 587 (Ala.), cert. denied, 513 U.S. 1023, 115 S.Ct. 591, 130 L.Ed.2d 504 (1994); Cox v. State, 660 So.2d 233 (Ala. Cr.App.1994).
"`In reviewing the reasonable doubt instruction, we do so in the context of the charge as a whole.' Victor v. Nebraska; Baker v. United States, 412 F.2d 1069 (5th Cir.1969), cert. denied, *955 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970); Williams v. State, 538 So.2d 1250 (Ala.Cr.App.1988). So long as the definition of `reasonable doubt' in the charge correctly conveys the concept of reasonable doubt, the charge will not be considered so prejudicial as to mandate reversal. Victor v. Nebraska; Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954)."
686 So.2d at 459.
We have reviewed the trial court's charge on reasonable doubt in the context of the entire oral charge and find that the instruction clearly conveyed the concept of reasonable doubt. The jury was properly instructed that it was to render a verdict based upon a careful consideration of the evidence and that it could convict Ferguson only if the State proved Ferguson's guilt beyond a reasonable doubt. The trial court repeatedly emphasized that the burden was on the State to prove Ferguson's guilt beyond a reasonable doubt; that a reasonable doubt could arise from the evidence or from a lack of evidence; and that the jury must acquit Ferguson if the State failed to prove each and every element of the capital offense (or of the lesser included offenses the trial court instructed it on) beyond a reasonable doubt. The instruction did not decrease or shift the State's burden of proof. See, e.g., Maples v. State, 758 So.2d 1 (Ala.Crim.App.), aff'd, 758 So.2d 81 (Ala.1999); Burgess v. State, [Ms. CR-93-2054, November 20, 1998] ___ So.2d ___ (Ala.Crim.App.1998). Moreover, the instruction was materially identical to the Alabama Proposed Pattern Jury Instructions for Use in the Guilt Stage of Capital Cases Tried Under Act No. 81-178. See, e.g., Price v. State, 725 So.2d 1003, 1058 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999)("A trial court's following of an accepted pattern jury instruction weighs heavily against any finding of plain error.").
Accordingly, we find no error, plain or otherwise, in the trial court's instructions on reasonable doubt.

XIII.
Ferguson contends that § 13A-5-47(e), Ala.Code 1975, which allows the trial court to override the jury's sentencing recommendation of life imprisonment without parole and sentence a defendant to death, is unconstitutional and that it results in the arbitrary imposition of the death penalty. Specifically, he argues that the statute "is constitutionally defective because it does not state what weight the trial court is to give the jury's recommendation." (Ferguson's brief to this court, p. 65.) Because Ferguson did not raise this claim in the trial court, we review it under the plain-error rule. See Rule 45A, Ala.R.App.P.
In Burgess v. State, 811 So.2d 557 (Ala. Crim.App.1998), aff'd in pertinent part, rev'd on other grounds, [Ms. 1980810, January 28, 2000][*] (Ala.2000), we stated the following regarding an identical claim:
"Burgess's claims with respect to § 13A-5-47(e) have been addressed and rejected by the United States Supreme Court in Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). The Court in Harris held that the `the Eighth Amendment does not require the State to define the weight the sentencing judge must give to an advisory jury verdict.' 513 U.S. at 512, *956 115 S.Ct. at 1036. The Court further held:
"`The Constitution permits the trial judge, acting alone, to impose a capital sentence. It is thus not offended when a State further requires the sentencing judge to consider a jury's recommendation and trusts the judge to give it the proper weight.'
"513 U.S. at 515, 115 S.Ct. at 1037. The Court in Harris noted that the `"Eighth Amendment is not violated every time a State reaches a conclusion different from a majority of its sisters over how best to administer its criminal laws."' 513 U.S. at 510, 115 S.Ct. at 1034, quoting Spaziano v. Florida, 468 U.S. 447, 464, 104 S.Ct. 3154, 3164, 82 L.Ed.2d 340 (1984).
"Alabama's capital sentencing statute `adequately channels the trial court's discretion so as to prevent arbitrary results.' Bush v. State, 695 So.2d 70, 94 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997)(citing Harris and rejecting claims that Alabama's statute permits a standardless override).
"Because Burgess's claims with respect to § 13A-5-47(e) have previously been addressed and rejected, there is no plain error as to this matter."
811 So.2d at 599. See also Jackson v. State, [Ms. CR-97-2050, May 28, 1999] ___ So.2d ___ (Ala.Crim.App.1999); Smith v. State, 756 So.2d 892 (Ala.Crim.App.1998), aff'd, 756 So.2d 957 (Ala.2000); Roberts v. State, 735 So.2d 1244 (Ala.Crim.App.1998), aff'd, 735 So.2d 1270 (Ala.1999); Burgess v. State, 723 So.2d 742 (Ala.Crim.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Knotts v. State, 686 So.2d 431 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997); Bush v. State, 695 So.2d 70 (Ala. Crim.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997); Rieber v. State, 663 So.2d 985 (Ala.Crim.App.1994), aff'd, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995); Carr v. State, 640 So.2d 1064 (Ala.Crim. App.1994); McGahee v. State, 632 So.2d 976 (Ala.Crim.App.), aff'd, 632 So.2d 981 (Ala.1993), cert. denied, 513 U.S. 1189, 115 S.Ct. 1251, 131 L.Ed.2d 132 (1995); Coral v. State, 628 So.2d 988 (Ala.Crim.App. 1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); McMillian v. State, 594 So.2d 1253 (Ala.Crim.App.1991), remanded on other grounds, 594 So.2d 1288 (Ala.1992). Accordingly, we find no error, much less plain error, as to this claim.

XIV.
Ferguson contends that the trial court erred in treating robbery both as an element of the capital offense and as an aggravating circumstance. He maintains that "double counting" robbery in this manner violated his "right to a reliable and rational sentence" and improperly subjected him to two punishments. (Ferguson's brief to this court, p. 63.) Because Ferguson did not raise this claim in the trial court, we review it for plain error. See Rule 45A, Ala.R.App.P.
This court and the Alabama Supreme Court have repeatedly held that using an element of capital murder as an aggravating circumstance is constitutionally permissible and does not violate a defendant's right to be free from double jeopardy. See Ex parte Windsor, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997); Jackson v. State, 791 So.2d 979 (Ala.Crim.App. 2000); Taylor v. State, 808 So.2d 1148 *957 (Ala.Crim.App.2000); Woods v. State, 789 So.2d 896 (Ala.Crim.App.1999); Jackson v. State, [Ms. CR-97-2050, May 28, 1999] ___ So.2d ___ (Ala.Crim.App.1999); Sneed v. State, 783 So.2d 841 (Ala.Crim.App.1999); Maples v. State, 758 So.2d 1 (Ala.Crim. App.), aff'd, 758 So.2d 81 (Ala.1999); Hardy v. State, 804 So.2d 247 (Ala.Crim.App. 1999); Drinkard v. State, 777 So.2d 225 (Ala.Crim.App.1998), rev'd on other grounds, 777 So.2d 295 (Ala.2000); Smith v. State, 756 So.2d 892, 904 (Ala.Crim.App. 1998), aff'd, 756 So.2d 957 (Ala.2000); Roberts v. State, 735 So.2d 1244 (Ala.Crim. App.1998), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 538 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999); Price v. State, 725 So.2d 1003 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); George v. State, 717 So.2d 849 (Ala.Crim.App.1997), aff'd, 717 So.2d 858 (Ala.), cert. denied, 525 U.S. 1024, 119 S.Ct. 556, 142 L.Ed.2d 462 (1998); Williams v. State, 710 So.2d 1276 (Ala. Crim.App.1996), aff'd, 710 So.2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); Ivery v. State, 686 So.2d 495 (Ala.Crim.App.1996); Burton v. State, 651 So.2d 641 (Ala.Crim. App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995); Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). Accordingly, the trial court did not err in "double counting" robbery both as an element of the offense and as an aggravating circumstance.

XV.
Ferguson contends that, in sentencing him to death, the trial court improperly considered nonstatutory aggravating circumstances. Specifically, he maintains that the trial court, in addition to finding the existence of the statutory aggravating circumstance that the murders were committed during the course of a robbery in the first degree, see § 13A-5-49(4), Ala.Code 1975, also considered the following as nonstatutory aggravation: (1) that Ferguson had the opportunity to "reflect and withdraw from his actions," but failed to do so; (2) the "nature of the crime and the defendant's involvement in it"; and (3) that Ferguson's "capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not substantially impaired." Because Ferguson did not object to the trial court's findings below, we review this claim only for plain error. See Rule 45A, Ala.R.App.P.
In Burgess v. State, [Ms. CR-93-2054, November 20, 1998] ___ So.2d ___ (Ala. Crim.App.1998), we stated the following regarding a similar claim:
"In the next paragraph of the sentencing order, labeled `Weighing of Aggravating and Mitigating Circumstances, Section 13A-5-48, Code of Alabama, 1975,' the trial court conducts its weighing of the circumstances. It is this discussion of the facts of the murder and the weighing of the aggravating and mitigating circumstances that Burgess claims is actually a finding of other nonstatutory aggravating circumstances. That is simply not the case.
"In Rutledge v. State, 523 So.2d 1087, 1103 (Ala.Cr.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988), we reviewed a similar claim that the trial court's weighing of the aggravating and mitigating circumstances was actually a finding of nonstatutory aggravating circumstances. We adopt our holding in Rutledge for this case. As in Rutledge, we hold:
"`It is true that the statements made by the trial court in paragraph *958 three of its sentencing order could possibly be applied to a great many capital cases; however, the facts of this case support the court's statements, which we believe are merely the court's editorial comments on the evidence presented. It is entirely proper for the trial court to consider all the facts presented by the evidence in imposing sentence. [§ 13A-5-47, Ala.Code 1975.] A logical reading of the sentencing order demonstrates that the trial court first made findings of the presence of aggravating circumstances (paragraph one) and then findings of mitigation (paragraph two), and then in paragraph three, he considered the facts of the case and weighed the aggravating and mitigating circumstances. Moreover, we presume that the trial court also followed the instructions it gave to the jury which charged that only the [one] designated aggravating circumstance could be considered.
"`When paragraph three is read in conjunction with paragraphs one and two, it is clear to us that the trial court, in imposing the death sentence, only considered the [one] aggravating circumstance enumerated in [§ 13A-5-49(4) ], which was entirely proper. We are not convinced that the contested language of paragraph three constitutes a finding by the court of nonstatutory aggravating circumstance[s].'
"Reading the trial court's sentencing order in its entirety, we hold that the trial court's commentary on the premeditated nature of the offense was merely that: a commentary on the facts of the case. The court's commentary on the `inherently disturbing' nature of an `individual who is willing to kill in order to acquire the property of another' was the trial court's basis for attributing a greater weight to the aggravating circumstance listed in § 13A-5-49(4) as compared to the mitigating circumstances. His comments on Burgess's remorse and his sanity were merely discussions of nonstatutory mitigating circumstances. It would take a strained interpretation of the trial court's weighing of the aggravating and mitigating circumstances to conclude that the court improperly considered any nonstatutory aggravating circumstances.
"Likewise, we decline to accept Burgess's argument that the trial court `triple counted' the aggravating circumstance that the murder was committed during the course of a robbery in sentencing him to death. Burgess argues that the trial court used that circumstance as an element of capital murder, as an aggravating circumstance, and again as the `attendant circumstances of the robbery ... considered as independent proof in aggravation of the crime.' This claim is not supported by the trial court's sentencing order.
"In the sentencing order, the trial court clearly set out the sole aggravating circumstance in this case. The language cited by Burgess reflects factors that are inherent in the aggravating circumstance that the murder was committed during a robbery. Some of the court's language also defined the nonstatutory mitigating circumstances. That language was not describing additional `attendant circumstances' but inseparable elements of the murderfactors which gave more weight to the aggravating circumstance of murder during a robbery over other mitigating circumstances. The meaning attributed by Burgess to the language in the trial court's order is strained and unrealistic. The trial court did not `triple *959 count' the circumstance that the murder was committed during a robbery."
___ So.2d at ___.
Likewise, we find Ferguson's interpretation of the trial court's sentencing order in this case to be "strained and unrealistic." Burgess, supra. In the section of its sentencing order regarding aggravating circumstances, the trial court found the existence of only onethat the murders were committed during the course of a robbery. The court specifically noted that it "f[ound] no other aggravating circumstances to exist." (C. 137.) In the section of its sentencing order discussing statutory mitigating circumstances, the trial court discussed each of the statutory mitigating circumstances in § 13A-5-51, Ala.Code 1975, and determined that only one statutory mitigating circumstance existedthat Ferguson had no significant history of prior criminal activity. See § 13A-5-51(1), Ala. Code 1975. In the section of its sentencing order discussing nonstatutory mitigating circumstances, the trial court found the existence of two nonstatutory mitigating circumstances: (1) that Ferguson turned himself into police and confessed to the crime; and (2) that the jury recommended a sentence of life imprisonment without the possibility of parole.
In the final two paragraphs of the trial court's sentencing order, the trial court weighed the aggravating circumstance and the mitigating circumstances. It is in this portion of the sentencing order that the trial court refers to Ferguson's opportunity to "reflect and withdraw from his actions"; the "nature of the crime and the defendant's involvement in it"; and Ferguson's "capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." After reviewing the trial court's sentencing order in its entirety, we conclude that the trial court's comments were merely that editorial comments on the evidence presented during both the guilt phase and the sentencing phase of Ferguson's trial. The trial court's comments on the nature of the crime, Ferguson's involvement in it, and Ferguson's opportunity to withdraw from his actions were clearly "the trial court's basis for attributing a greater weight to the aggravating circumstance listed in § 13A-5-49(4) as compared to the mitigating circumstances." Burgess, supra. In addition, the trial court's reference to Ferguson's ability to appreciate the criminality of his conduct or to conform his conduct to the law was merely an allusion to the fact that the trial court had found that this mitigating circumstance did not exist. As in Burgess, supra, "[i]t would take a strained interpretation of the trial court's weighing of the aggravating and mitigating circumstances to conclude that the court improperly considered any nonstatutory aggravating circumstances." Accordingly, we find no error, plain or otherwise, as to this claim.

XVI.
Ferguson contends that the trial court erred in failing to consider and to find several statutory and nonstatutory mitigating circumstances. Because Ferguson did not object to the trial court's findings below, we review these claims only for plain error. See Rule 45A, Ala.R.App.P.
"In Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Supreme Court held that a death penalty statute cannot constitutionally preclude consideration of relevant mitigating factors. However, Lockett does not require that all evidence offered as mitigating evidence be found to be mitigating. Lockett provides that a state may not exclude evidence that the defendant claims is mitigating. This does not mean that all evidence offered by the *960 defendant as mitigating must be found to be mitigating and considered as such in the sentencing process."
Ex parte Hart, 612 So.2d 536, 542 (Ala. 1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993).
"`While Lockett and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.'" Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), quoting Bankhead v. State, 585 So.2d 97, 108 (Ala. Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala. Crim.App.1992), rev'd, 625 So.2d 1146 (Ala. 1993). "Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact." Harrell v. State, 470 So.2d 1303, 1308 (Ala.Crim.App. 1984), aff'd, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
"`A sentencer in a capital case may not refuse to consider or be "precluded from considering" mitigating factors. Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982)(quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978)). The defendant in a capital case generally must be allowed to introduce any relevant mitigating evidence regarding the defendant's character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); Ex parte Henderson, 616 So.2d 348 (Ala.1992); Haney v. State, 603 So.2d 368 (Ala.Cr. App.1991), aff'd, 603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Moreover, the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating. Morrison v. State, 500 So.2d 36 (Ala.Cr. App.1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987).'"
Wilson v. State, 777 So.2d 856, 892 (Ala. Crim.App.1999), quoting Williams v. State, 710 So.2d 1276, 1347 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). The fact that the trial court does not list and make findings in its sentencing order as to the alleged nonstatutory mitigating circumstances offered by a defendant indicates only that it found some evidence not to be mitigating, not that it did not consider the evidence. See, e.g., Ingram v. State, 779 So.2d 1225 (Ala. Crim.App.1999).
It is clear from the sentencing order in this case that the trial court properly considered all of the mitigating evidence Ferguson offered. The record reflects that Ferguson was not limited in any way regarding the evidence he presented or the arguments that he made. In its *961 sentencing order, the trial court treated each statutory mitigating circumstance listed in § 13A-5-51, Ala.Code 1975; made conclusions as to the existence or nonexistence of each circumstance; and made specific findings of fact regarding each circumstance. Although the trial court did not list and make findings as to each nonstatutory mitigating circumstance offered by Ferguson, it did include a section in its sentencing order indicating that, in compliance with § 13A-5-52, Ala.Code 1975, it had considered the nonstatutory mitigation offered by Ferguson, and it specifically found the existence of two nonstatutory mitigating circumstances: (1) that Ferguson had turned himself into police and had confessed to the crime; and (2) that the jury had recommended a sentence of life imprisonment without the possibility of parole. Thus, we have no doubt that the trial court fully complied with Lockett and its progeny and considered all the evidence offered by Ferguson in mitigation.
We now turn to whether the trial court's findings regarding the existence or nonexistence of specific mitigating circumstances were proper.

A.
First, Ferguson contends that the trial court erred in failing to find as statutory mitigation: (1) that he was under the influence of extreme mental or emotional disturbance, see § 13A-5-51(2), Ala.Code 1975; (2) that his ability to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired, see § 13A-5-51(6); and (3) that he was acting under extreme duress or the substantial domination of another person, see § 13A-5-51(5). Ferguson maintains that, in finding that these mitigating circumstances did not exist, the trial court improperly applied the standard of legal insanity by requiring him to "be so impaired as to be legally excusable from any criminal liability before it would consider giving mitigating effect" to these circumstances. (Ferguson's brief to this court, p. 11.) He claims that the trial court's findings that he knew right from wrong, that he was not insane, and that he had exercised his own volition in participating in the crimes showed that the trial court had improperly applied the standard for an insanity defense when considering the mitigating circumstances. In addition, he maintains that the trial court's findings were "flatly contradicted by the record," which, he says, further showed that the trial court applied the wrong standard. We disagree.
In its sentencing order, the trial court made the following findings regarding these circumstances:
"2. The Capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance. Does Not Exist.
"Although the clinical psychologist testified that the defendant had a low I.Q., may be mildly retarded, and may be handicapped mentally, he also testified he did not suffer from any delusions or was psychotic. He knew right from wrong and was not insane. He had the ability to make choices, had a good job, was married, had advanced in his job, and had opportunities. There was no evidence that the defendant suffered from any extreme mental or emotional disturbances.
". . . .
"5. The defendant acted under extreme duress or under the substantial domination of another person. Does Not Exist.
"Although the evidence supports the fact that the defendant was afraid of being killed by Mark Moore if he did not follow his instructions, there was no evidence *962 that Mark Moore verbally had threatened the defendant with such actions or indicated such result to the defendant other than the defendant's belief of this. The defendant had a choice of not being involved in the killing and robbing of Harold and Joey Pugh. And the people involved in this met several times before the crime was carried out and even after the killings the people involved met together. Mark Moore was not physically present when the defendant shot Harold and Joey Pugh. In the defendant's statement, he at first indicated that Mark Moore was present, but all the evidence reflects that Mark Moore was not present at Cane Creek on the day of the occurrence of the killing of Harold and Joey Pugh. And the defendant said he lied when he stated Moore was present. The defendant indicated that he was very much in control of the events surrounding the killings and he further took part in the bank robbery later in Mississippi, and during one of the meetings he confessed he shot and killed Harold and Joey Pugh. The contention by the defendant that he lacks the ability to weigh things, his intellect is low, he looked up to Mark Moore as a leader, relied on other people to get things done, is found by the Court to be simply an expression of the defendant's personality. The evidence reflects that he was not insane and had a good job, had advanced in his job, was married, and had other opportunities. Therefore, the Court finds that said mitigating circumstance does not apply.
"6. The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. Does Not Exist.
"The defendant's action in or around the time of the killings indicate that he knew he was committing a criminal act, he tried to cover up his actions after the murders were committed."
(C. 138-39.)
Contrary to Ferguson's contention, merely because the trial court used the word "insane" in its sentencing order and found that Ferguson knew right from wrong does not mean that the court applied the standard of legal insanity to Ferguson's proffered mitigating evidence. After reviewing the record and the trial court's sentencing order, we conclude that the trial court did not require Ferguson to prove that he was legally insane in order to show that he was under the influence of an extreme mental or emotional disturbance, that his ability to appreciate the criminality of his conduct was substantially impaired, or that he was under extreme duress or the substantial domination of another person. The trial court merely found that the evidence presented by Ferguson which was, at best, weak and conflicting was unpersuasive. The trial court's findings are amply supported by the evidence.
At the sentencing hearing, Dr. James F. Chudy, a clinical psychologist hired by Ferguson to evaluate Ferguson for purposes of the sentencing hearing, testified that Ferguson was functioning in the borderline range of intelligence, but that he was not mentally retarded. He stated that this borderline intelligence could possibly impair Ferguson's "reasoning in social situations"; that it could affect his ability to "reason abstractly"; and that it could "diminish to a degree" his ability to appreciate the consequences of his actions. In addition, Dr. Chudy diagnosed Ferguson as having a "personality disorder" with borderline features. Dr. Chudy stated that this disorder could result in mood swings that could affect Ferguson's relationships. Dr. Chudy also stated that Ferguson *963 may have some "transient or brief" psychotic periods where he is "out of touch with reality." However, in his written report, Dr. Chudy stated that Ferguson's claims of psychotic episodesi.e., hearing voices that told him to do things to other people and having hallucinations of people and objects movingwere "difficult to substantiate" and that the accuracy of those claims "remains in question." Dr. Chudy also stated in his report that there were "no signs of disturbance in [Ferguson's] thinking"; that Ferguson was not psychotic; and that Ferguson's thinking was merely "illogical."
In rebuttal, the State called Dr. Stephen Rosen, a clinical psychologist who had examined Ferguson before trial pursuant to a court order. Dr. Rosen testified that Ferguson was in the borderline range of intelligence, but that he was not mentally retarded. Dr. Rosen also testified that he believed Ferguson was malingering during the testing and that, although the test results showed that Ferguson had an IQ of 69, Dr. Rosen believed that had Ferguson put forth an effort when taking the IQ test, he would have scored in the middle to high 70s. Regarding the crime, Dr. Rosen said, Ferguson first told him that he did not do it and then said that he was an unwilling participant; by the end of the evaluation, however, Ferguson was claiming that voices had told him to commit the crime. Dr. Rosen stated that during the evaluation Ferguson attempted to give him "the impression that he was more disturbed than in fact he was" by exaggerating and claiming symptoms he believed to be signs of a mental disorderspecifically, by claiming that he heard voices and saw "little green men [who] were laughing and telling him to do things." Dr. Rosen, like Dr. Chudy, also diagnosed Ferguson as having a personality disorder and stated that the disorder could result in mood swings, antisocial traits, and perhaps some transient or temporary episodes where Ferguson is "out of touch with reality."
"The factual determination of the existence or nonexistence of a mitigating circumstance is within the sound discretion of the trial judge where the evidence in that regard is in conflict." Wesley v. State, 575 So.2d 108, 121 (Ala.Crim. App.1989), rev'd on other grounds, 575 So.2d 127 (Ala.1990). Moreover,
"`[w]e fully recognize that "[a] factfinder is not bound by expert testimony `even if all of the witnesses are presented by only one side.'" Ellis v. State, 570 So.2d 744, 752 (Ala.Cr.App.1990). "In Alabama, opinion testimony of an expert witness is binding upon a jury only when such testimony concerns a subject which is exclusively within the knowledge of experts and the testimony is uncontroverted." Jefferson County v. Sulzby, 468 So.2d 112, 116 (Ala.1985). "An expert's opinion, however, is not conclusive on the trial court, even though uncontroverted. See Kroger Co. v. Millsap, 280 Ala. 531, 196 So.2d 380 (1967). Rather, a trial court must look to the entire evidence and its own observations in deciding factual issues." Williams v. City of Northport, 557 So.2d 1272, 1273 (Ala.Civ.App.1989), cert. denied, 498 U.S. 822, 111 S.Ct. 71, 112 L.Ed.2d 45 (1990). "Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact." Harrell v. State, 470 So.2d 1303, 1308 (Ala.Cr.App.1984), affirmed, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).'"
Perkins v. State, 808 So.2d 1041, 1137 (Ala. Crim.App.1999), quoting Carroll v. State, 599 So.2d 1253, 1272 (Ala.Crim.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, *964 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994).
As to Ferguson's claim that he was under the influence of an extreme mental or emotional disturbance and that his ability to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired, although both Dr. Chudy and Dr. Rosen diagnosed Ferguson with a personality disorder, neither concluded that Ferguson was suffering from an extreme mental or emotional disturbance or that Ferguson's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired, and neither related Ferguson's general diagnosis to the events in this case. Both described the disorder as merely causing "mood swings" that might lead to "possible problems" with his environment and in his relationships, and both found his claims of psychotic episodes to be unsubstantiated and questionable. In addition, although evidence showed that Ferguson had an IQ of 69, there was no evidence that Ferguson was mentally retarded (See Part XVI.C. of this opinion, infra), and Dr. Rosen stated that he believed Ferguson purposely attempted to perform poorly on the IQ test and that had Ferguson put forth an effort, his IQ would have been somewhere in the middle to high 70s.
Moreover, contrary to Ferguson's contention that his ability to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired because he says, he "had been drinking and smoking marijuana" on the day of the killings, we find that the trial court's findings in this regard were amply supported by the record. "Voluntary intoxication will not constitute the mitigating circumstance that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, where the defendant did not show that he was so intoxicated as to render himself incapable of appreciating the criminality of his conduct." Williams v. State, 710 So.2d 1276, 1346 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). Although there was evidence that Ferguson had been drinking and smoking marijuana on the day of the murders, there was no evidence that Ferguson's level of intoxication was so great that his ability to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired. Rather, there was ample evidence, including, as the trial court correctly noted, Ferguson's attempts to cover up the crime, to show that Ferguson was not so intoxicated as to substantially impair his ability to appreciate the criminality of his conduct or to conform his conduct to the law. Accordingly, the trial court did not err in not finding that Ferguson was laboring under an extreme mental or emotional disturbance or that Ferguson's ability to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired.
As to Ferguson's claim that he was under the substantial domination of Mark Moore when he committed the murders, we likewise find that the trial court did not err in finding that this circumstance did not exist. Although both experts testified that Ferguson was "easily influenced" and Ferguson's wife, Karen Ferguson, testified that Ferguson always did what Mark Moore told him to do, as the trial court correctly noted, Moore was not present at the time of the murders; and there was no evidence, other than Ferguson's assertion, that Moore had ever threatened Ferguson. In fact, Mrs. Ferguson testified that the relationship between *965 Moore and Ferguson was not a threatening one, but a loving one, like that of a father and son. Thus, the trial court's finding that Ferguson was not acting under extreme duress or under the substantial domination of Mark Moore was amply supported by the evidence. Thus, the trial court did not err in failing to find that Ferguson was under extreme duress or the substantial domination of another person.

B.
Ferguson also contends that the trial court erred in failing to find that he was an accomplice and that his participation in the crime was relatively minor. See § 13A-5-51(4), Ala.Code 1975. In its findings regarding this circumstance, the trial court found: "The defendant was with Craig Maxwell in the boat with Harold and Joey Pugh, and the evidence reflects that the defendant had a .357 pistol and shot first Harold Pugh, and then Joey Pugh." (C. 138.) The evidence presented at trial indicated that Ferguson was not merely an accomplice, but was, in fact, an active participant in the murders of Harold and Joey Pugh. Accordingly, the trial court did not err in not finding this statutory mitigating circumstance to exist.

C.
Ferguson contends that the trial court erred in not finding as a nonstatutory mitigation circumstance that Ferguson was mentally retarded. He maintains that there was "substantial evidence" of his mental retardation which, he says, the trial court ignored by "ma[king] no mention of this fact or its mitigating value" in its sentencing order. (Ferguson's brief to this court, p. 15.)
Initially, we note that the trial court did refer to the evidence of Ferguson's low intelligence in several parts of its sentencing orderin its findings of fact from the sentencing phase of the trial, in reference to the statutory mitigating circumstances argued by Ferguson, and in reference to the nonstatutory mitigation offered by Ferguson. As stated above, although the trial court did not list this circumstance in its specific findings of nonstatutory mitigating circumstances, "the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating." Wilson v. State, 777 So.2d 856, 892 (Ala.Crim.App.1999), quoting Williams v. State, 710 So.2d 1276, 1347 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).
Moreover, contrary to Ferguson's contention, we find no evidence in the record indicating that Ferguson was mentally retarded. In fact, both Ferguson's expert, Dr. Chudy, and the State's expert, Dr. Rosen, stated unequivocally that Ferguson was not mentally retarded. Although there was evidence that Ferguson had an IQ of 69 and was in the borderline range of intelligence, Dr. Rosen testified that the results of Ferguson's IQ test were deceptive because, Dr. Rosen said, Ferguson had purposefully not put an effort into the test in order to appear more troubled than he really was. Dr. Rosen stated that it was his belief that had Ferguson made an effort when taking the test, his IQ would have been in the middle to upper 70s. Clearly, the trial court did not err in not finding, as a nonstatutory mitigating circumstance, that Ferguson was mentally retarded.

D.
Ferguson contends that the trial court erred in failing to find that his "traumatic childhood" was a nonstatutory mitigating *966 circumstance. He maintains that there was "compelling evidence" that he had had a difficult relationship with his mother, that he had suffered a severe emotional trauma as an adolescent when he discovered that the person he believed to be his father was really his stepfather, that he was suicidal, and that he "cried often" as a result of his troubled background.
As stated above, "[m]erely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact." Harrell v. State, 470 So.2d 1303, 1308 (Ala. Crim.App.1984), aff'd, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Although there was evidence that Ferguson may have had a difficult childhood, there was also testimony that Ferguson's difficult life was made more difficult by his own actions and that the allegedly "significant emotional trauma" of finding out that his father was really his stepfather was not, as he claimed, "a full scale trauma." Accordingly, the trial court did not err in finding that Ferguson's "problems during his childhood [were] not a mitigating factor." (C. 140.)

E.
Ferguson also contends that the trial court erred in not finding as a nonstatutory mitigating circumstance the fact that two of his codefendants, Mark Moore and Donald Risley, received sentences less than death. He maintains that Moore and Risley were "arguably more involved" in the crime than he was, and that, therefore, the trial court should have considered the fact that they were given lighter sentences to be mitigating. We disagree.
"While the trial court may consider the different treatment of codefendants as a mitigating circumstance, it is not required to do so." Griffin v. State, 790 So.2d 267 (Ala.Crim.App.1999). Here, the two codefendants who received sentences less than death and who Ferguson maintains were "more involved" in the crime than he was, were not even present at the time of the killings of Harold and Joey Pugh, and, according to defense counsel's assertions, were not convicted of capital murder as Ferguson was. We point out that the one codefendant who was present at the time of the murders, and who, like Ferguson, actively participated in the murders, Craig Maxwell, was, like Ferguson, convicted of capital murder and was sentenced to death. Clearly, the trial court did not err in failing to find the fact that Moore and Risley, who were not convicted of capital murder and who were not present at the time of the murders, received lesser sentences to be a mitigating circumstance.

F.
Finally, Ferguson contends the trial court erred in failing to find his remorse for the crime to be a nonstatutory mitigating circumstance. In this regard, Ferguson points to his wife's testimony and to his statement to police to support his claim that he was remorseful. Ferguson's wife, when pleading for Ferguson's life at the sentencing hearing, testified that Ferguson was "really sorry that this whole situation ever happened." In his statement to policein which Ferguson continually denied committing the murders, denied having a gun, and expressed his hope "to keep [his] life and not end up in no chair"stated that he "ha[d] been crying everyday" and having nightmares about the murders. However, Ferguson never expressed any remorse during the sentencing phase of his trial or even to the two clinical psychologists who had examined him. Although the trial court could have considered the limited, and questionable, *967 evidence of Ferguson's remorse as a nonstatutory mitigating circumstance, it was not required to do so. We find that the evidence supports the trial court's decision in discounting the limited evidence of Ferguson's remorse and not finding this to be a mitigating circumstance.
Because it is clear from a review of the entire record that the trial court understood its duty to consider all the evidence presented by Ferguson in mitigation, that the trial court did, in fact, consider all the evidence presented by Ferguson, and that the trial court's findings are supported by the evidence, we find no error in the trial court's findings regarding the statutory and nonstatutory mitigating circumstances.

XVII.
Ferguson contends that Alabama's method of execution constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. (Issue XXI in Ferguson's brief to this court.) However, it is well settled that neither the death penalty, nor electrocution as a means of capital punishment, is cruel and unusual punishment in violation of the Eighth Amendment. See, e.g., Jackson v. State, 791 So.2d 979 (Ala.Crim.App.2000); Taylor v. State, 808 So.2d 1148 (Ala.Crim.App.2000); Williams v. State, 795 So.2d 753 (Ala. Crim.App.1999); Woods v. State, 789 So.2d 896 (Ala.Crim.App.1999); Griffin v. State, 790 So.2d 267 (Ala.Crim.App.1999); Wilson v. State, 777 So.2d 856 (Ala.Crim.App. 1999); Bryant v. State, [Ms. CR-98-0023, November 19, 1999] ___ So.2d ___ (Ala. Crim.App.1999); Duncan v. State, [Ms. CR-95-1544, September 17, 1999] ___ So.2d ___ (Ala.Crim.App.1999); Ingram v. State, 779 So.2d 1225 (Ala.Crim.App. 1999); Jackson v. State, [Ms. CR-97-2050, May 28, 1999] ___ So.2d ___ (Ala.Crim. App.1999); Maples v. State, 758 So.2d 1 (Ala.Crim.App.), aff'd, 758 So.2d 81 (Ala. 1999); Drinkard v. State, 777 So.2d 225 (Ala. Crim.App.1998), rev'd on other grounds, 777 So.2d 295 (Ala.2000); Smith v. State, 756 So.2d 892, 904 (Ala.Crim.App. 1998), aff'd, 756 So.2d 957 (Ala.2000); Stewart v. State, 730 So.2d 1203 (Ala.Crim. App.1997), aff'd, 730 So.2d 1246 (Ala.), cert. denied, 528 U.S. 846, 120 S.Ct. 119, 145 L.Ed.2d 101 (1999); Scott v. State, 728 So.2d 164 (Ala.Crim.App.1997), aff'd, 728 So.2d 172 (Ala.1998), cert. denied, 528 U.S. 831, 120 S.Ct. 87, 145 L.Ed.2d 74 (1999); Williams v. State, 627 So.2d 985 (Ala. Crim.App.1991), aff'd, 627 So.2d 999 (Ala. 1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). Accordingly, Ferguson's argument is meritless.

XVIII.
Ferguson also contends that § 15-12-21(d), Ala.Code 1975, which limits court-appointed attorneys' fees to $1,000 for out-of-court work in each phase of a capital murder trial, is unconstitutional. Specifically, he argues that this limitation on compensation violates the separation-of-powers doctrine; that it constitutes a taking without just compensation; that it deprives an indigent capital defendant of the effective assistance of counsel; and that it denies an indigent defendant equal protection of the law. These claims were not presented in the trial court; thus, our review is for plain error. Rule 45A, Ala. R.App.P.
Ferguson's claims have been previously addressed and rejected by this court and by the Alabama Supreme Court. See, e.g., Ex parte Smith, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997); Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); *968 Samra v. State, 771 So.2d 1108 (Ala.Crim. App.1999); Hyde v. State, 778 So.2d 199 (Ala.Crim.App.1998); Stewart v. State, 730 So.2d 1203 (Ala.Crim.App.1997), aff'd, 730 So.2d 1246 (Ala.1999); Barbour v. State, 673 So.2d 461 (Ala.Crim.App.1994), aff'd, 673 So.2d 473 (Ala.1995), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996); May v. State, 672 So.2d 1307 (Ala.Crim.App.1993), writ quashed, 672 So.2d 1310 (Ala.1995); Johnson v. State, 620 So.2d 679 (Ala.Crim.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993); and Smith v. State, 581 So.2d 497 (Ala.Crim.App.1990), rev'd on other grounds, 581 So.2d 531 (Ala. 1991), aff'd on return to remand, 698 So.2d 189 (Ala.Crim.App.1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997). Accordingly, there is no plain error as to this matter.

XIX.
Ferguson contends that the cumulative effect of all the errors allegedly committed in the trial of his case violated his rights to due process, to a fair trial, and to a reliable sentencing proceeding. We do not agree. We have reviewed each and every allegation of error as well as the cumulative effect of those alleged errors and we find no basis for a reversal. Moreover, the claimed errors to which Ferguson refers have now been determined to be without merit. Because no single instance of alleged error constituted reversible error, we will not consider the cumulative effect to be any greater. See Boyd v. State, 715 So.2d 825, 851 (Ala.Crim.App. 1997), aff'd, 715 So.2d 852 (Ala.1998).

XX.
In accordance with Rule 45A, Ala.R.App. P., we have examined the record for any plain error with respect to Ferguson's capital murder convictions and death sentence, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in the proceedings, either in the guilt phase or in the sentencing phase of the trial.
We have also reviewed Ferguson's sentence in accordance with § 13A-5-51, Ala.Code 1975, which requires that, in addition to reviewing the case for any error involving Ferguson's capital murder convictions, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating circumstances and the mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is a proper sentence, we determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Ferguson of the capital offenses charged in the indictment, a separate sentence hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala.Code 1975. After hearing evidence concerning aggravating and mitigating circumstances, after being properly instructed by the trial court as to the applicable law, and after being correctly *969 advised as to its function in finding any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury recommended, by a vote of 11-1, that Ferguson be sentenced to life imprisonment without the possibility of parole.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala.Code 1975, to aid it in determining whether it would sentence Ferguson to death or to life imprisonment without parole as the jury recommended. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). After the hearing, the trial court entered specific written findings concerning each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975, and any mitigating circumstance found to exist under § 13A-5-52, Ala.Code 1975, as well as written findings of fact summarizing the offense and Ferguson's participation in the offense.
In its findings of fact, the trial court found the existence of one statutory aggravating circumstance: that the murders were committed while Ferguson was engaged in the commission of a robbery, see § 13A-5-49(4), Ala.Code 1975. The trial court found the existence of one statutory mitigating circumstance: that Ferguson had no significant history of prior criminal activity, see § 13A-5-51(1), Ala.Code 1975. The trial court also heard testimony regarding Ferguson's character or record and any of the circumstances of the offense that Ferguson offered as a basis for sentencing him to life imprisonment without parole instead of death, see § 13A-5-52, Ala.Code 1975. In this regard, the trial court found the following evidence to be mitigating: (1) that Ferguson surrendered to the authorities and that he confessed to his involvement in the murders (although, as the trial court noted in its sentencing order, he did not do so immediately after the murders but instead waited until one month after the murders); and (2) that the jury recommended life imprisonment without the possibility of parole.
The trial court's sentencing order reflects that after considering all the evidence presented, the presentence report, and the advisory verdict of the jury and after weighing the aggravating circumstance against the statutory and nonstatutory mitigating circumstances in the case, the trial court found that the aggravating circumstance outweighed the statutory and nonstatutory mitigating circumstances. Accordingly, the trial court sentenced Ferguson to death. The trial court's findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence.
Ferguson was convicted of the offenses of murder committed during a robbery, murder of two or more persons by one act or pursuant to one scheme or course of conduct, and the murder of a child less than 14 years of age. These offenses are defined by statute as capital offenses. See § 13A-5-40(2), (10), and (15), Ala.Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., cases dealing with murders committed during a robbery: Sneed v. State, 783 So.2d 841 (Ala.Crim.App.1999); Hardy v. State, 804 So.2d 247 (Ala.Crim.App.1999); Burgess v. State, 811 So.2d 557 (Ala.Crim.App.1998); Clemons v. State, 720 So.2d 961 (Ala.Crim. App.1996), aff'd, 720 So.2d 985 (Ala.1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999); Williams v. State, 710 So.2d 1276 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 *970 (1998); Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Brownlee v. State, 545 So.2d 151 (Ala.Crim.App.1988), aff'd, 545 So.2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989); Hallford v. State, 548 So.2d 526 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989); Davis v. State, 536 So.2d 110 (Ala.Crim.App.1987), aff'd, 536 So.2d 118 (Ala.1988), cert. denied, 490 U.S. 1028, 109 S.Ct. 1766, 104 L.Ed.2d 201 (1989); see also, e.g., cases dealing with the murder of two or more persons pursuant to one course of conduct: Wilson v. State, 777 So.2d 856 (Ala.Crim. App.1999); Freeman v. State, 776 So.2d 160 (Ala.Crim.App.1999); Pilley v. State, 789 So.2d 870 (Ala.Crim.App.1998), rev'd on other grounds, 789 So.2d 888 (Ala.2000); Burgess v. State, 723 So.2d 742 (Ala.Crim. App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Taylor v. State, 666 So.2d 36 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996); Siebert v. State, 555 So.2d 772 (Ala.Crim.App.), aff'd, 555 So.2d 780 (Ala. 1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990); Fortenberry v. State, 545 So.2d 129 (Ala.Crim. App.1988), aff'd, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990); Hill v. State, 455 So.2d 930 (Ala.Crim.App.), aff'd, 455 So.2d 938 (Ala.), cert. denied, 469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984); see also, e.g., cases dealing with the murder of a child under 14 years of age: Ward v. State, 814 So.2d 899 (Ala.Crim.App.2000); Dunaway v. State, 746 So.2d 1021 (Ala. Crim.App.1998).
After carefully reviewing the record of the guilt phase and the sentencing phase of Ferguson's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We conclude that the findings and the conclusions of the trial court are amply supported by the evidence. We have independently weighed the aggravating circumstance against the statutory and nonstatutory mitigating circumstances, and we concur in the trial court's judgment that the aggravating circumstance outweighs the mitigating circumstances, and that death is the appropriate sentence in this case. Considering Ferguson and the crime he committed, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
For the reasons stated above, Ferguson's convictions and sentence of death are affirmed.
AFFIRMED.
McMILLAN, COBB, BASCHAB, and FRY, JJ., concur.
NOTES
[1] Moore was Ferguson's wife's stepfather.
[2] Maxwell was also convicted and sentenced to death for the capital murders of Harold and Joey Pugh. We affirmed his conviction and death sentence in Maxwell v. State, [Ms. CR-97-2150, May 26, 2000] ___ So.2d ___ (Ala.Cr.App.2000).
[*] Note from the reporter of decisions: On July 21, 2000, on application for rehearing, the Supreme Court withdrew its January 28, 2000, opinion in Ex parte Burgess and substituted another one.